**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | |
|---|---|
| ANTHONY ARAGON WRIGHT, | Case No.:2:23-cv-00383 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| CROSSCOUNTRY MORTGAGE, LLC; DOVENMUEHLE MORTGAGE, INC.; EQUIFAX INFORMATION SERVICES, LLC; and TRANS UNION, LLC, | |
| Defendants. | |

Plaintiff Anthony Aragon Wright ("Plaintiff" or "Mr. Wright"), by and through undersigned counsel, brings this Complaint and Demand for Jury Trial against Defendants CrossCountry Mortgage, LLC ("CrossCountry"); Dovenmuehle Mortgage, Inc. ("Dovenmuehle"); Equifax Information Services, LLC ("Equifax"); and Trans Union, LLC ("Trans Union"), (Equifax and Trans Union, together the "CRAs"; CrossCountry and Dovenmuehle together the "Furnishers", and CRAs and Furnishers collectively the "Defendants"), alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.*

# I.  **INTRODUCTION.**

1.      Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq*. by the Defendants. "Consumer reports" under §1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

2.      Plaintiff contends CRAs to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports, and consequently reported inaccurate information about Plaintiff in violation of §1681e(b).

3.      Plaintiff contends CRAs failed to conduct a reasonable investigation required after each and every dispute Plaintiff submitted to CRAs as required under §1681i.

4.      Plaintiff contends Furnishers failed to conduct a reasonable investigation required as required under §1681s-2(b), after each and every dispute Plaintiff submitted to CRAs and forwarded by CRAs to Furnishers.

5.      Plaintiff's Complaint further arises from violations of the Florida Consumer Collection Practices Act ("FCCPA"), §559.55, Fla. Stat. by CrossCountry.

6.      Plaintiff contends that CrossCountry made claims, attempts or

threatened to enforce debts that CrossCountry knew are not legitimate or which rights do not exist, in violation of §559.72(9).

## II.    JURISDICTION AND VENUE.

7.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §1331 because Plaintiff allege violations of the Fair Credit Reporting Act, a federal law. See 15 U.S.C. §1681p (permitting actions to enforce liability in an appropriate United States District Court).

8.     Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the FCCPA claims because they are so related to Plaintiff's claims under the FCRA that they form part of the same case or controversy under Article III of the United States Constitution.

9.     Venue in the Middle District of Florida is proper pursuant to 28 U.S.C. §1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

10.     Defendants transact business in this District; Defendants purposefully avail themselves of the protections of this District; and Defendants regularly direct business at the District, such that personal jurisdiction is established.

## III.   PARTIES

11.     Plaintiff is a natural person who resides in Arcadia, Florida.

12.     Plaintiff is a "consumer" as defined by §1681a(c) and by §559.55(8), Fla. Stat.

13.     CrossCountry is a Delaware limited liability company with principal place of business at 2160 Superior Avenue, Cleveland, OH 44114.

14.     CrossCountry can be served through its registered agent The Corporation Trust Company located at Corporation Trust Center, 1209 Orange St, Wilmington, DE 19801.

15.     CrossCountry is a "furnisher" of consumer credit information as that term is contemplated by §1681s-2, and is a "debt collector" as defined by §559.55(7), Fla. Stat.

16.     Upon information and belief, CrossCountry is not licensed by the Florida Office of Financial Regulation as a "consumer collection agency".

17.     Dovenmuehle is a Delaware corporation with principal place of business at 1 Corporate Drive Suite 360, Lake Zurich, IL 60047.

18.     Dovenmuehle can be served through its registered agent The Corporation Trust Company located at Corporation Trust Center, 1209 Orange St, Wilmington, DE 19801.

19.     Dovenmuehle is a "furnisher" of consumer credit information as that term is contemplated by §1681s-2.

20.     Equifax is a "consumer reporting agency," as defined in §1681a(f). On

information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in §1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309-2402 and can be served through its registered agent at Corporation Service Company 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

21.     Trans Union is a "consumer reporting agency," as defined in §1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in §1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661 and can be served at its registered agent at Illinois Corporation Service Company 801 Adlai Stevenson Drive, Springfield, IL 62703.

22.     During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Florida and conducted business in the State of Florida on a routine and systematic basis.

23.     CRAs regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in §1681a(d), to third parties. CRAs regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues,

using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by §1681a(f).

24.     During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

25.     Any violations by Defendants were not in good faith, were knowing, negligent, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## IV.   FACTUAL ALLEGATIONS.

26.     On or about May 16, 2022, Plaintiff co-signed, with his sister-in-law, on a mortgage loan for his family's home in Florida, provided by mortgage lender CrossCountry.

27.     The mortgage loan has a monthly payment of $1,479 dollars.

28.     On September 28, 2022, Plaintiff's home was devastated by Hurricane Ian.

29.     Plaintiff and his family, like their community, had no electricity, tap water, or internet.

30.     Hurricane Ian's surprise, immediate, and devastating impact affected the ability of many Floridians, including Plaintiff, to continue making timely mortgage payments.

31.     In response, some mortgage lenders provided expedited and streamlined options for mortgage relief.[1]

32.     On or about October 7, 2022, Plaintiff called CrossCountry's Mortgage Loss Mitigation Department and spoke with a representative whose initials were "MMZ".

33.     Plaintiff explained that he and his family had been devastatingly affected by Hurricane Ian, causing Plaintiff to lose wages and needing to incur emergency expenses food, gas, temporary repair materials such as tarps and window covers, and cleaning supplies.

34.     MMZ suggested that Plaintiff apply for CrossCountry's Hurricaine Ian Forbearance program (the "Forbearance") which would suspend all mortgage payments for the months of October, November and December of 2022 and tack those payments on at the end of their mortgage.

35.     During the telephone call, seeing no other option and hoping that he would be able to recover from Hurricaine Ian and meet his obligations to keep their home, Plaintiff agreed to and applied for the Forbearance.

36.     MMZ then stated she had entered Plaintiff into the Forbearance and

---

[1] See, e.g., FreddieMac, Media Room, https://freddiemac.gcs-web.com/news-releases/news-release-details/freddie-mac-reminds-homeowners-path-hurricane-ian-immediate (last visited on April 14, 2023); Fannie Mae, Newsroom, Press Release, https://www.fanniemae.com/newsroom/fannie-mae-news/homeowners-renters-and-mortgage-servicers-disaster-relief-options-hurricane-ian  (last visited on April 14, 2023).

stated Plaintiff would have to call in every month to confirm that Plaintiff was in Forbearance status.

37.   On October 6, electricity was restored.

38.   On or about October 24, 2022, Plaintiff received a letter from CrossCountry. The letter read at the top "APPROVED FORBEARANCE AGREEMENT" and notified that the Forbearance would suspend mortgage payments for the three months of October, November, and December of 2022.

39.   The letter also stated that there was enclosed an agreement, but there were no enclosures.

40.   When Plaintiff realized that there was no forbearance agreement attached, he immediately called CrossCountry.

41.   CrossCountry's representative explained that Plaintiff should not worry with sending a written agreement because of the circumstances of Plaintiff's Forbearance, meaning Hurricane Ian. The representative apologized and explained that the letter was a form letter.

42.   Thereafter, Plaintiff received another letter dated October 24 stating that Plaintiff was late on his payments. Immediately, Plaintiff called CrossCrountry and explained that he had received a collection letter but that he was in Forbearance. The representative apologized and stated that they would add the notation to their file so the mistake not happen again.

43.    On or about October 26, Plaintiff called in and spoke with a representative whose initials were KNS. Plaintiff confirmed that he was in Forbearance status as had been requested and promised. Plaintiff also asked about the collection letter and call he had received.

44.    KNS explained that because Plaintiff's Forbearance had been approved, all of those late fees would be removed. KNS also stated the Plaintiff's Forbearance was "actually" approved just two days prior.

45.    On or about November 7, Plaintiff received a "reminder notice". Plaintiff called CrossCountry's collection department and again explained that Plaintiff had applied and been approved for Forbearance. The representative replied that they would make a note on Plaintiff's file.

46.    On November 16, Plaintiff's internet connection was restored.

47.    On or about November 29, Plaintiff called in to confirm that he was in Forbearance status as had been requested and promised.

48.    Plaintiff attributed the collection attempts he had received from CrossCountry to the consequences of Hurricane Ian on systems and files, and thought nothing more of it. In fact, he had been expressly told so by CrossCountry's representatives several times.

49.    On December 27, 2022, Plaintiff sent in his regular payment for January 2023 of $1,500 and attached the forbearance letter he had received in October.

50.     However, in or around January 2023, Plaintiff received a statement indicating Plaintiff's new monthly payments, effective on February 1, 2023, had shot up to $1,623.04.

51.     Upon information and belief, the increased monthly payments were due only to the non-payment in October, November and December 2022.

52.     On or about January 16, 2023, the son of Plaintiff's sister-in-law —who is a co-signer in Plaintiff's mortgage— needed a new vehicle and Plaintiff's sister-in-law co-signed for that car loan.

53.     The car loan was denied.

54.     The car dealer explained that the lender, Wayne Westland Federal Credit Union, had denied the car loan based on, and upon review of, a consumer report provided by Trans Union.

55.     Plaintiff's sister-in-law, confused, pulled her Trans Union, Equifax, and Experian credit reports in an attempt to discover the reason for the denial.

56.     On or about January 18, Plaintiff's sister-in-law informed Plaintiff's wife of the denial of her son's auto loan as a result of the inaccurate information on her credit reports.

57.     Understandably, Plaintiff's relationship with his sister-in-law, who had co-signed Plaintiff's mortgage as a favor, soured.

58.     Worse still, Plaintiff later discovered that, in contravention to the

forbearance agreement, CrossCountry had directed that the January 2023 monthly payment Plaintiff had timely sent, had been applied not to January 2023 but to cover the debt purportedly still owed for the month of October 2022.

59.    Put simply, CrossCountry was negligently, recklessly, or intentionally, repudiating the forbearance agreement.

60.    On or about January 25, 2023, Plaintiff received a call from his loan officer, Becky Sikorski. Ms. Sikorski asked what was happening with their loan because she had seen a report where Plaintiff's loan was marked as "in default".

61.    Plaintiff explained that he had applied and been approved for the Forbearance due to Hurricane Ian.

62.    Ms. Sikorski reviewed Plaintiff's computer record and found that his account had been "miscoded" based on her other customers who had also applied for Forbearance due to Hurricane Ian, who had a natural disaster coded in their accounts.

63.    Plaintiff's account, she continued, did not have the natural disaster code but was simply coded as "in default".

64.    She ended the call after explaining that she would escalate the matter with her manager and attempt to get Plaintiff's records fixed.

65.    Ms. Sikorski followed up with Plaintiff by text message.

66.    On January 25, 2023, Plaintiff sent in his "updated" payment for

February 2023 of $1,650, $150 more than before.

67.    On or about January 25, 2023, Plaintiff's wife received a text message from Becky Sikorski stating that she had "good news".

68.    Ms. Sikorski appears to have been incorrect.

69.    In or around January 2023, Plaintiff reviewed his consumer reports. Plaintiff was shocked to discover that Equifax, Trans Union, and non-party Experian were each reporting late payments on the account associated with the CrossCountry mortgage and being furnished by Furnishers (Account No. 31014920****) (the "CrossCountry Account").

70.    Further, upon information and belief, the balance owed on the CrossCountry Account reflected a balance that had been inflated to account non-payments.

71.    Surprisingly, both Equifax and Trans Union were remarking the CrossCountry Account as "Affected by natural disaster".

72.    The late payment notations and increased balance artificially, erroneously, and inaccurately reduced Plaintiff's credit score and credit standing, increasing the interest Plaintiff pays for debts subject to a variable interest.

73.    Plaintiff's inaccurately lower credit score also excludes Plaintiff from promotional rates and credit reserved for better qualified consumers.

74.    On or about February 4, 2023, Plaintiff sent letters to Equifax and Trans

Union. In the letters, Plaintiff disputed Equifax and Trans Union's reporting of the CrossCountry Account because he had been told his payments would be moved to the end of his loan as a result of the hurricane.

75.   Plaintiff's dispute letters enclosed a copy of the forbearance letter from CrossCountry.

76.   Plaintiff's letters contained Plaintiff's name and personal identifiers, and a clear identification of the CrossCountry Account.

77.   Upon information and belief, both CRAs forwarded copies of Plaintiff's dispute letters to the Furnishers.

78.   On February 7, 2023, Equifax received Plaintiff's dispute letter.

79.   Upon information and belief, Equifax did not respond to Plaintiff's letter.

80.   On or about February 10, 2023, Plaintiff's wife received another text message from Ms. Sikorski, stating that her manager had reached out to CrossCountry's servicing department to have the issues with the CrossCountry Account corrected.

81.   On a letter dated February 16, 2023, Plaintiff received Trans Union's investigation results.

82.   Trans Union's investigation results indicated that Furnishers had corrected their reporting of the CrossCountry Account, which would then report with

no missed payments and a balance owed that did not include late fees or other penalties.

83.    Trans Union's letter also reflected that the CrossCountry Account was affected by a natural or declared disaster.

84.    On or about March 10, 2023, Plaintiff received a deeply concerning message from Credit Karma.

85.    Immediately, Plaintiff pulled his credit reports from Equifax and Trans Union.

86.    Plaintiff was shocked to discover that both Equifax and Trans Union were now reporting Plaintiff as being late for 90-119 days, as well as an increased balance to account for, upon information and belief, late payment fees and interest.

87.    Both Equifax and Trans Union had removed the remark that the debt was affected by a natural disaster.

88.    Neither Equifax nor Trans Union gave Plaintiff notice as required under §1681i(a)(5)(B)(ii).

89.    Upon information and belief, Equifax and Trans Union also failed to comply with the other requirements under §1681i(a)(5)(B), especially requiring the Furnishers to submit certifications of accuracy.

90.    Surprisingly, both Equifax and Trans Union were reporting internally inconsistent information, because they reported the CrossCountry with a late

payment of 90-119 days but no missed payments, not even in October, November or December 2022.

91.     Upon information and belief, non-party Experian did not reinsert the disputed and later corrected information.

92.     Upon information and belief, Equifax and Trans Union failed to consider all the information contained in Plaintiff's dispute, particularly the copy of the forbearance letter and the fact that the CrossCountry Account was furnished with remarks showing the debt was affected by a natural disaster.

93.     Upon information and belief, Equifax and Trans Union failed to conduct a reasonable investigation into the matters disputed by Plaintiff, as required under §1681i.

94.     Upon information and belief, Equifax and Trans Union failed to report the results of its investigation to Experian and the Furnishers.

95.     Upon information and belief, Equifax and Trans Union conducted no investigation at all, let alone a reasonable investigation. Instead, Equifax and Trans Union blindly parroted the information furnished by Furnishers even when the furnished information was internally inconsistent and contradicted prior furnishings.

96.     As a result of Equifax and Tran Union's failure to conduct a reasonable investigation, Equifax and Trans Union continued to report inaccurate information concerning Plaintiff in violation of their duties under the FCRA.

97.    Equifax and Trans Union do not follow reasonable procedures to assure maximum possible accuracy of the information they report concerning a particular consumer.

98.    Equifax and Trans Union have not designed and implemented procedures to assure maximum possible accuracy of the information Equifax and Trans Union sell to third parties because their investigation protocols prioritize cost-saving over accuracy and are biased in favor of their furnishers.

99.    Upon information and belief, Equifax and Trans Union are aware that the global savings from conducting minimal investigations, far surpass the damages Equifax and Trans Union may be eventually required to pay consumers injured by their violations of their duties under the FCRA.

100.    In or around March, 2023, Plaintiff switched jobs and had to return the vehicle he was given by his old employer. As a consequence, Plaintiff had to use the family's sole car for his new job, leaving his wife and family with no means of transportation.

101.    Worried that the inaccurate information would be published by Equifax and/or Trans Union, Plaintiff applied for pre-qualification only with Capital One Auto Finance.

102.    On a letter dated March 29, 2023, Capital One Auto Finance informed Plaintiff that his application for pre-qualification had been denied.

103.   Capital One Auto Finance's letter expressly cited for the denial that "There are too many delinquent past or present mortgage credit obligation(s)" as reported by Equifax and Trans Union.

104.   The only mortgage or real estate debt on Plaintiff's reports is the CrossCountry Account.

105.   Capital One Auto Finance's denial has deterred Plaintiff away from applying with other auto loan lenders, forcing Plaintiff's family to spend more on alternative means of transportation or being unable to get to placed they needed to, all with the attendant inconvenience this has caused in time and frustration.

106.   Plaintiff followed the procedures established by the FCRA for CRAs and Furnishers to stop reporting inaccurate information on Plaintiff's credit report.

107.   On several occasions, Plaintiff communicated directly with CrossCountry and was assured the Forbearance had been approved and that CrossCountry's mistakes in sending collection attempts and reporting Plaintiff as late in his payments would be corrected in due time.

108.   Instead, even to this day, CrossCountry has been attempting to trick Plaintiff into executing a new promissory note for the allegedly missed payments and late fees, and a modification of his mortgage.

109.   Due to CRAs and Furnishers' ardent refusal to comply with their respective obligations under the FCRA, Plaintiff was forced to obtain legal advice

and counsel, for which he has incurred attorneys' fees and other expenses.

110.   Further due to CRAs and Furnishers' ardent refusal to comply with their respective obligations under the FCRA, Plaintiff expended countless hours disputing the inaccurate reporting with CRAs, repeatedly, to no or little avail.

111.   CRAs and Furnishers' violations have so distressed Plaintiff and his family that they are still in fear of losing their home and have thus not even unpacked the boxes of the effects they salvaged from the devastation caused by Hurricane Ian.

112.   It has taken Plaintiff an incredible amount of time and patience to communicate with CrossCountry, document events, and make the increased payments demanded by CrossCountry, all of which affected his and his family's well being and their ability to recover from Hurricane Ian, as well as spend time on their personal obligations and enjoyment of their free time.

113.   In addition to impacting his work productivity and income, dealing with the consequences of CRAs and Furnishers' unlawful conduct has strained Plaintiff's family relationships, including with his wife and his sister-in-law.

114.   CRAs and Furnishers unlawful conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that CRAs and Furnishers would never correct their inaccurate reporting, prolonging the damage suffered from Hurricane Ian.

115.   At all times pertinent hereto, CRAs and Furnishers were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the CRAs and Furnishers.

116.   At all times pertinent hereto, the unlawful conduct of CRAs and Furnishers, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

117.   CrossCountry particularly was repeatedly put on notice and even recognized that the mistake originated in the miscoding of Plaintiff's debt as "in default", when it should have been coded as in forbearance due to being affected by a natural disaster.

118.   CRAs have a long history of disregarding the credit reporting rights of consumers under the FCRA.

119.   As a standard practice, CRAs do not conduct independent investigations in response to consumer disputes. Instead, CRAs merely parrot the response of Furnishers, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by §1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation'

that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at \*6 (S.D.N.Y. Nov. 19, 2008); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed).

120.   CRAs are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the CRAs' violations of the FCRA are not negligent but intentionally downplayed or disregarded, and therefore their violations are willful.

121.   CRAs' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

122.   As a result of CRAs and Furnishers' unlawful conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time, money, labor and effort disputing and trying to have his reports corrected.

123.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish

and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being told that the problem would be addressed but never was.

### *CrossCountry's Violations of FCCPA*

124.   Upon information and belief, CrossCountry had actual and/or imputed notice that Plaintiff had been approved for forbearance for the months of October, November and December 2022.

125.   Nonetheless, CrossCountry has been attempting to collect from Plaintiff the principal, interest and late fees when Plaintiff was in forbearance for.

126.   On multiple times, CrossCountry attempted to collect from Plaintiff by calling Plaintiff on the phone.

127.   On multiple occasions, CrossCountry attempted to collect from Plaintiff by sending collection letters.

128.   CrossCountry attempted to collect from Plaintiff by sending a promissory note to include the principal, interest and late fees when Plaintiff was in forbearance to Plaintiff's mortgage.

129.   CrossCountry has increased Plaintiff's monthly payments due to, in whole or in part, the principal, interest and late fees when Plaintiff was in forbearance.

130.   CrossCountry has misapplied Plaintiff's monthly payments for the months of January, February, March, April, and May, to principal, interest and late fees —incorrectly— considered in default for the months of October, November and December 2022.

131.   On or about May 23, 2023, Plaintiff received yet another collection attempt from CrossCountry. On its letter, dated May 10, 2023, CrossCountry stated it would withhold the insurance proceeds from the damage caused to Plaintiff's home by Hurricane Ian, because CrossCountry —incorrectly— claimed that Plaintiff was in default on his monthly payments.

132.   All of the cited collection attempts by CrossCountry were in violation of the Forbearance that CrossCountry had approved Plaintiff for.

133.   CrossCountry's collection attempts are false, deceptive and misleading because CrossCountry falsely represented the character, amount, or legal status of Plaintiff's debt as modified by the Forbearance.

134.   CrossCountry's collection attempts further contained false representations and were deceptive means to attempt to collect a debt or to obtain information concerning Plaintiff.

135.   CrossCountry's collection attempts further claimed, attempted, and threaten to enforce a debt when CrossCountry knew that the debt is not legitimate because CrossCountry had approved Plaintiff's Forbearance.

136.   CrossCountry is well aware of the FCCPA.

137.   CrossCountry's violations of the FCCPA did not result from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

138.   As a result of CrossCountry's unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from CrossCountry since January 2023, concerning October, November and December 2023, forced Plaintiff to relive and compound the pain, stress, and suffering from the consequences of Hurricane Ian, confusion about the relief CrossCountry had promised under the Forbearance, and extreme distress from the fear of losing their family's home.

139.   Each and every attempt to collect from CrossCountry caused Plaintiff's relationship to his wife and sister-in-law to strain.

140.   Upon each and every attempt to collect from CrossCountry, Plaintiff had to expend time, effort and money into attempting to have CrossCountry correct its inaccurate records and cease making unlawful collection attempts.

*Wright, Anthony Aragon v. Equifax Information Services, LLC, et al.*
Complaint

## COUNT I

**Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681e(b)**

**CRAs' Failure to Follow Reasonable Procedures to**

**Assure Maximum Possible Accuracy**

141.   Plaintiff incorporates by reference paragraphs 1 to 120 of this Complaint as though fully set forth herein at length.

142.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." §1681e(b).

143.   Equifax and Trans Union prepared patently false consumer reports concerning Plaintiff.

144.   The reports prepared by Equifax and Trans Union included inaccurate information which had been previously removed following Plaintiff's disputes.

145.   Equifax and Trans Union reinserted the inaccurate information without complying with §1681i(a)(5)(B).

146.   Despite actual and implied knowledge that Plaintiff was not in default pursuant to a forbearance agreement, as acknowledged by Furnishers following Plaintiff's disputes, Equifax and Trans Union readily and repeatedly sold such false

reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff was in default.

147.   As evidenced by Capital One Auto Finance's denial letter, Equifax and Trans Union's reporting reasonably leads potential lenders to consider Plaintiff non-bankable.

148.   CRAs violated §1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files CRAs published and maintained concerning Plaintiff.

149.   As a result of CRAs and Furnishers' unlawful conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time, money, labor and effort disputing and trying to have his reports corrected.

150.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being told that the problem would be addressed but never was.

151.   CRAs' conduct, actions, and inactions were willful, rendering CRAs'

liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, CRAs were negligent, entitling Plaintiff to recover damages under §1681o.

152.   Plaintiff is entitled to recover attorneys' fees and costs from CRAs in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT II

### Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681i

### CRAs' Failure to Conduct a Reasonable Investigation

153.   Plaintiff incorporates by reference paragraphs 1 to 120 of this Complaint as though fully set forth herein at length.

154.   The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. §1681i(a)(1).

155.   The FCRA imposes a 30-day limitation for the completion of such an investigation. *Id*.

156.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that

item of information from the consumer's file. §1681i(a)(5)(A).

157.    The FCRA further provides that if a CRA deletes information as a result of an investigation of disputed information which confirmed that the information was in fact inaccurate or if the CRA was unable to verify the accuracy of the disputed information, the CRA may not "reinsert" that information unless the furnisher certifies that the information is "accurate" and then the CRA sends notice to the consumer within 5 business days from the reinsertion. §1681i(a)(5)(B).

158.    Throughout the five years preceding the filing of this Complaint, Plaintiff disputed the reporting of inaccurate information by CRAs and requested that CRAs correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the notation that Plaintiff was in default when he was in fact in forbearance due to Hurricane Ian.

159.    Plaintiff supported his disputes with copies of the forbearance letter he received from CrossCountry.

160.    Despite actual and implied knowledge that Plaintiff was not in default pursuant to a forbearance agreement, as acknowledged by Furnishers following Plaintiff's disputes, Equifax and Trans Union readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff was in default.

161.    Plaintiff expended resources in the form of time and money to

repeatedly dispute the patently inaccurate reporting with CRAs.

162.   Equifax and Trans Union's "reinvestigations" and "reinsertions" were rendered that much more deficient considering Experian deleted the inaccurate late payment notations and did not reinsert the inaccurate information.

163.   Equifax's failure to respond to Plaintiff's dispute, prolonged the harm suffered by Plaintiff.

164.   CRAs violated §1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

165.   CRAs further violated §1681i by failing to comply with any of the requirements under §1681i(a)(5)(B) when reinserting information deleted as a result of a dispute from Plaintiff.

166.   As a result of CRAs and Furnishers' unlawful conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time, money, labor and effort disputing and trying to have his reports corrected.

167.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being told that the problem would be addressed but never was.

168.   CRAs' conduct, actions, and inactions were willful, rendering CRAs liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, CRAs were negligent, entitling Plaintiff to recover under §1681o.

169.   Plaintiff is entitled to recover attorneys' fees and costs from CRAs in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT III

**Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b)**

**Furnishers' Failure to Conduct an Investigation of the Disputed Information**

**and Review of all Relevant Information Provided by the Consumer**

170.   Plaintiff incorporates by reference paragraphs 1 to 120 of this Complaint as though fully set forth herein at length.

171.   Furnishers violated §1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's

dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct Furnishers' own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to CRAs; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to CRAs.

172.   Furnishers further violated §1681s-2(b) by failing to certify that the information they furnished following Plaintiff's dispute was "accurate" as required under §1681i(a)(5)(B).

173.   As a result of CRAs and Furnishers' unlawful conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time, money, labor and effort disputing and trying to have his reports corrected.

174.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being told that the problem would be addressed but never was.

175.    Furnishers' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, Furnishers were negligent, entitling Plaintiff to recover under §1681o.

176.    Plaintiff is entitled to recover attorneys' fees and costs from Furnishers in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT VII

### Violation of the Florida Consumer Collection Practices Act

### §559.55, Fla. Stat.

### CrossCountry's False, Deceptive and Misleading Communications

177.    Plaintiff incorporates by reference paragraphs 1 to 140 of this Complaint as though fully set forth herein at length.

178.    CrossCountry violated the FCCPA by claiming, attempting, and threatening to enforce debts when CrossCountry knew that the debts are not legitimate, or asserted the existence of some other legal right, because CrossCountry were on actual or imputed notice that Plaintiff had been approved for Forbearance, in violation of §559.72(9).

179.    As a result of CrossCountry's unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from CrossCountry since January 2023, concerning October, November and December 2023, forced Plaintiff to relive and

compound the pain, stress, and suffering from the consequences of Hurricane Ian, confusion about the relief CrossCountry had promised under the Forbearance, and extreme distress from the fear of losing their family's home.

180.    Each and every attempt to collect from CrossCountry caused Plaintiff's relationship to his wife and sister-in-law to strain.

181.    Upon each and every attempt to collect from CrossCountry, Plaintiff had to expend time, effort and money into attempting to have CrossCountry correct its inaccurate records and cease making unlawful collection attempts.

182.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment, specially the fear of losing his family's home.

183.    CrossCountry's conduct, actions, and inactions were willful, rendering them liable for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to §559.77(2).

184.    Plaintiff is entitled to recover attorneys' fees and costs from CrossCountry in an amount to be determined by the Court pursuant to §559.77(2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment be entered against

Defendants, for the following:

a)    Actual damages pursuant to 15 U.S.C. §§1681n, 1681o;

b)    Statutory damages pursuant to 15 U.S.C. §§1681n, 1681o;

c)    Punitive damages pursuant to 15 U.S.C. §1681n;

d)    Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§1681n, 1681o;Actual, statutory and punitive damages pursuant to §559.77(2), Fla. Stat.;

e)    Costs and reasonable attorneys' fees pursuant to §559.77(2), Fla. Stat.;

f)    Any pre-judgment and post-judgment interest as may be allowed under the law; and

g)    Other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: May 30, 2023                    **CONSUMER ATTORNEYS**

*/s/ Santiago J Teran*
Santiago J Teran (FL Bar No. 1018985)
E-mail: steran@consumerattorneys.com
Consumer Attorneys
2125 Biscayne Bldv., Ste 206
Miami, FL 33137
Direct: (347) 946-7990
Facsimile: (718) 715-1750

Consumer Attorneys
8245 N. 85th Way
Scottsdale, AZ 85258

*Attorney for Plaintiff*
*Anthony Aragon Wright*